**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ANTHONY LAWRENCE** | **CIVIL ACTION** |
| **VERSUS** | **NO.  12-2816** |
| **SHERIFF MARLIN N. GUSMAN,** | **UNITED STATES MAGISTRATE** |
| **ORLEANS, MEDICAL DEPARTMENT** | **JUDGE KAREN WELLS ROBY** |

**ORDER AND REASONS**

This matter was before the Court for non-jury trial on December 2, 2013, upon consent of the parties pursuant to 28 U.S.C. § 636(c).[1]  The plaintiff, Anthony Lawrence ("Lawrence"), filed *pro se* a complaint pursuant to 42 U.S.C. § 1983 alleging that he was denied adequate medical care while previously housed in the Orleans Parish Prison ("OPP") by the defendants, Sheriff Marlin N. Gusman, the medical department at the OPP and Dr. Samuel Gore.

**I.**     **Testimony and Evidence at Trial**

    **A.**     **Testimony of the Plaintiff, Anthony Lawrence**

Lawrence testified on direct and cross-examination to the following matters.  He was diagnosed with bladder cancer in December 2011, and underwent several surgeries.  In January 2012, he had his bladder and prostate removed at the Louisiana State University ("LSU") Hospital. He remained in the hospital until April 2012.  He was told that the surgery was successful and the doctors believed they removed all of the cancer by removing his bladder and prostate.

---

[1]Rec. Doc. No. 15.

Lawrence indicated that he also had several follow-up appointments to learn how to care for the stoma[2] and how to use the bags. He explained that the stoma was the port he used to attached the urostomy bags to collect urine. He was given several bags to take home and contact information to obtain a six month supply from an indigent medical supply program. The program would only provide him with about 20 bags at a time. He was instructed to change his bags about three times per week. He placed a second order for bags shortly before his arrest, but he was not able to pick them up from the program because of his arrest.

He was scheduled for a follow-up appointment at LSU Hospital on June 27, 2012, but was arrested that day and taken to OPP. He was charged with failure to register as a sex offender.[3] He previously received a 15 month sentence for failing to notify the sheriff's department that he was in Dallas, Texas. After serving his time, he returned to New Orleans. He was arrested for failing to register himself in New Orleans.

Upon booking, he told prison officials that he had cancer, a urostomy bag, and scheduled follow-up appointments at the hospital. He indicated that his bag needed changing when he was arrested. He also indicated that, when the bag gets full, the glue or adhesive that holds the bag to his skin at the stoma would give way. The bag would then leak.

He stated that a nurse at the prison told him that she was not sure if they had bags to fit him. He was given towels to help with the leaking urine, because the nurse never sent him any bags.

_____

[2]A stoma is a minute opening or pore. Stedman's Medical Dictionary, p. 1701 (Lippincott, Williams & Wilkins, 27th Ed.) ("Stedman's").

[3]Lawrence testified that he was charged in 2000 with sexual battery and kidnapping. He entered a plea of guilty and served four months in prison with a requirement that he register as a sex offender.

2

Lawrence stated that he was uncomfortable and became smelly as he remained in the holding cell for three or four days.  He did not receive any additional bags or medical treatment, nor was he taking to the medical unit.  He instead had to ask for more towels which he received from the guards.  He stated that the urostomy bags he was initially offered by the nurse did not fit his stoma.

He was eventually placed in regular population in the dormitory tent seven, where he remained until February 20, 2013, when he was released.  During that time, in July 2012, he was sentenced to serve six months on the failure to register charge.

He stated that he filed his first sick call request on July 1, 2012.  Medical personnel responded on July 2, 2012, that he was awaiting an appointment with the doctor.  Over the next two months he was in OPP, he had to get bags brought in from his family.  His girlfriend was able to bring him about six bags left from his first supply received from the indigent program.  Because of the steamy, damp environment in the tent, each bag lasted about one and half days before the adhesive would fail.  When he ran out of bags, he did not have any more bags at home, because he was arrested before he could retrieve his second order of bags from the indigent program.  He further explained that, while in the dormitory tent, he only had access to a stand up shower.  The steam and water temperature effected the glue on the bag reducing the life of the bags when he had them.  He stated that Nurse Thomas eventually put a skin barrier on to help the bags last longer to no avail.

On July 12, 2012, he filed a grievance complaint, number 707340,  asking to be moved to the medical tier.  He received a response from Warden C. Ezeb on July 18, 2012, indicating that he would notify the medical department.  Lawrence recalled that he was seen by "Dr. Gray," who is actually not a doctor, but a certified family nurse practitioner.  She found that he had a rash at the stoma site, but he was never given the cream she ordered for it.

On August 8, 2012, Lawrence filed a grievance complaint, number 710683, complaining that he was sleeping on the floor and using towels to wrap his bag port.  On August 14, 2012, in grievance number 710646, he complained that he needed medical attention for his urostomy.  He received a response from Warden Ezeb indicating that no action would be taken.  He, nevertheless, was given extra bed sheets and continued to get extra towels, which he used to help hold the bags on to his body and stay dry from the leaking urine.  He also said that he tried to tape the bag to his skin, but that also did not work.  He recalled that he did not get to see medical personnel again until the end of August or into early September.

Upon reviewing his records, he found that on August 23, 2012, he submitted a sick call form, but was not seen until September 10, 2012.  At that time, Nurse Thomas examined him and was going to try to locate the bags he needed, but he never received them.

Lawrence further indicated that, on September 17, 2012, he wrote a grievance complaint, number 711121, to Sheriff Gusman about getting a follow-up hospital appointment.  Other personnel responded to that complaint.  The Sheriff later responded to another grievance complaint, number 718019, indicating that he would speak to the medical director.

Lawrence further testified that, after he filed several grievances, in either August or September, the prison eventually began to provide him with bags about three or four times a month.  The bags were different from the ones he received from the hospital and indigent program.  In addition, he did not receive them often enough and had to resort to the towels to absorb the leakage and hold the bags against his body.

Lawrence explained that the bags from the prison were one-piece units, where the whole bag slipped onto the stoma directly.  He had to remove the whole bag to clean it, and once he did, the

adhesive would not work.  The bags he had from the hospital and indigent program were two-piece bags that came with a barrier.  The bag could be removed from the other piece for easier cleaning.

He also stated that, on September 24, 2012, he filed another grievance, number 713763, asking to see the doctor and to be moved to the medical tier.  The response from personnel only indicated that he had not completed a sick call request with the grievance.  He did not receive a response to his step two complaint.  He also recalled that he completed sick call requests on September 10, 2012 and October 10, 2012.

In the meantime, on October 3, 2012, in grievance number 717646, he informed Sheriff Gusman that his bags needed to be changed.  The Sheriff eventually responded to his earlier grievance that he would speak with the medical director.

He saw Nurse Deborah Gray on October 4, 2012 and she examined him and gave him naprosyn and fiber to help with his pain.  She indicated that she was still awaiting Lawrence's outside medical records and a date for an appointment at the hospital.  She also directed that Lawrence see Dr. Dileo for evaluation in one week.  He also was seen by Nurse Thomas and another nurse on October 10, 2012.

Lawrence recalled that he submitted another grievance form, number 718020, on November 1, 2012, complaining that he needed to get bags from outside of the prison, because the bags provided to him were not working.  He complained that the prison simply did not want to pay for the type of bags he needed or give him more of the other bags so he could change them more often.

Lawrence also did not receive additional medication until he was seen by Dr. Gore at sick call on November 12, 2012, at the request of Sheriff Gusman.  He saw a doctor one other time and was given additional naprosyn.

5

Lawrence stated that, on November 28, 2012, he filed grievance number 719797 to thank the medical staff for the naprosyn and fiber, and notified them that the fiber was making his mouth swell.  He also wrote to Sheriff Gusman again on November 29, 2012, about the shower conditions and nats biting his face.  He believed that the nats were attracted to him by the urine smell.  Sheriff Gusman replied indicating that the prison would address the problems and continue repairs on the tent showers.

He was seen by Dr. Dileo on December 12, 2012, about receiving naprosyn and the one-piece bags from the prison (instead of the two piece bags from the hospital).  He completed another sick call complaint on December 19, 2012, complaining of stomach pain.  Nurse Gray examined his external abdomen and gave him two naprosyn for pain.  On January 2, 2013, he was given milk of magnesia by one of the doctors for his continuing stomach pain.

He also was eventually taken back to the LSU hospital for a follow-up examination after this Court held the *Spears* Hearing on January 10, 2013.  That was his first follow-up appointment he had since before his arrest.  At that time, the doctor found an internal infection in the stoma site.  The doctor prescribed milk of magnesia, naprosyn, faracon fiber, and the antibiotic cyprofloxacin for the infection.  The doctor also scheduled an appointment for him at the uroscopy clinic for March 2013.

Afterwards, at the prison, he was still not given proper bags.  Instead, he was given tape on January 25, 2013 to assist with holding the bags in place while he showered.  He also saw one of the doctors on February 13, 2013, who reordered the bag changes stay at three times per week.

When he was released from prison in February 2013, he went to the LSU hospital for the previously scheduled appointment.  He was examined and given an antibiotic for the stoma infection and prescription cream for his skin.  He also scheduled another uroscopy.  Since that time, he has

been back to the LSU doctors for a CT-scan, blood work and another stoma check.  His infection and pain have cleared since his release and treatment by the LSU doctors.

      **B.**     **Testimony of the Defendant, Dr. Samuel Gore**

Dr. Gore, the Medical Director for the Orleans Parish Sheriff's Office, testified on direct and cross-examination to the following matters.  In his capacity as medical director for seven years, Dr. Gore occasionally treats inmate-patients, gives guidance to the other doctors and medical staff, i.e. nurses, at the prison, assures that medical care is provided to the inmates, and communicates with the prison administration.

He stated that he does not have a daily evaluation policy regarding the medical doctors and staff at the prison.  Instead, when they are hired, they have a 90-day probationary period.  There is no other quality evaluation except regular patient chart reviews done in the normal course of treatment.  Any issues could be incorporated into the employee's annual evaluation.  He also testified that the medical staff includes three full time provider positions comprised of two nurse practitioners and three part-time internal medicine doctors who share one full-time position.

With regard to Lawrence, Dr. Gore stated that, although he was a special needs patient, his medical condition did not require close monitoring.  Therefore, he was not placed on the medical tier.  He further testified that the medical care for his urostomy would be relatively simple and only required attention about once a week.  He indicated, however, that urostomy bags are typically changed three times per week.  He indicated that changing the bags more often, in his opinion, could cause the adhesive to injure or aggravate the skin.  He also believed that the one-piece bags are more sterile than the two-piece bags mentioned by Lawrence.  He also stated that Nurse Gray, as a nurse practitioner, is certified to examine and prescribe medication to patients.

Dr. Gore also reviewed portions of the plaintiff's medical records admitted into evidence, most of which were already addressed by the plaintiff. He noted that Lawrence filed his first sick call request on July 1, 2012. On July 2, 2012, Nurse Thompson noted that no treatment was necessary. On July 24, 2012, the nurse practitioner, Nurse Gray, put in a request to have Lawrence moved to the medical unit and made the first attempt to get a referral for him to return to the LSU urology clinic. The hospital asked for more information which was provided by the medical staff on July 27, 2012. Dr. Gore did not know who voided Gray's directive to have Lawrence moved to the medical unit.

He also explained that, once an outside appointment is requested, the medical department had no real process in place to follow-up on how long it takes to receive replies. Instead, the medical personnel just send the requests in and note them in the records when (if) they are returned from the scheduling officer at the facility.

He also testified that the medical records showed that he ordered that Lawrence be provided with different one-piece bags in November 2012. He noted that Lawrence was also seen by the nursing staff on October 18 and 24, 2012.

## II.   **Findings of Fact and Conclusions of Law**[4]

Lawrence brought suit in this Court to seek redress under §1983 for the denial of adequate medical care he received at OPP from the defendants Sheriff Gusman, Dr. Gore, and the OPP medical department. The testimony, evidence and applicable law, leading to the Court's resolve are indicated below.

### A.   **General Standards of Review for Conditions of Confinement**

---

[4]To the extent the findings of fact are conclusions of law, and vice versa, they are deemed so and accepted.

Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment. *Zara v. Strain*, 458 F. App'x 393, 393-94 (5th Cir. 2012); *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir.1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979)). The distinction is primarily one of formality, however, because to determine whether a pretrial detainee's rights have been violated under the Fourteenth Amendment, the court applies an analysis identical to that applied in Eighth Amendment cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996). The plaintiff, therefore, must show that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his welfare or safety. *See Neals v. Norwood,* 59 F.3d 530, 533 (5th Cir. 1995).

The Eighth Amendment's prohibition on "cruel and unusual punishments" forbids conditions of confinement "which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society' ... or which 'involve the unnecessary and wanton infliction of pain.'" *Estelle v. Gamble*, 429 U.S. 97, 102-103 (1976) (citations omitted). "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

A state actor may be liable under § 1983 only if he "was personally involved in the acts causing the deprivation of his constitutional rights or a causal connection exists between an act of the official and the alleged constitutional violation." *Douthit v. Jones*, 641 F.2d 345 (5th Cir. 1981); *see also Watson v. Interstate Fire & Casualty Co.*, 611 F.2d 120 (5th Cir. 1980). Furthermore, the official must have acted with deliberate indifference to be liable under § 1983. An official is deliberately indifferent to an inmate's health and safety in violation of the Eighth Amendment "only

if he knows that the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Jones v. Greninger*, 188 F.3d 322, 326 (5th Cir. 1999). "Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of harm." *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 1991). Whether pretrial or convicted, the plaintiff must prove facts sufficient to show "at a minimum, that the prison officials realized there was imminent danger and have refused--consciously refused, knowingly refused--to do anything about it." *Campbell v. Greer*, 831 F.2d 700, 702 (7th Cir. 1987).

### B.     Defendants' Motion for Judgment as a Matter of Law

The defendants moved at trial for judgment as a matter of law as to Lawrence's claims against Sheriff Gusman and Dr. Gore. Defendants argued that neither defendant can be held liable under §1983 on the basis of vicarious supervisory liability and that Lawrence did not prove an intentional indifference by either defendant. For the reasons given at trial, as supplemented herein, the motion was granted as to Sheriff Gusman and denied as to Dr. Gore.

Rule 52(c) of the Federal Rules of Civil Procedure provides that "[i]f during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party." *Bodin v. Vagshenian*, 462 F.3d 481 (5th Cir. 2006). Judgment on partial findings entered under Rule 52(c) is to be made after the district court has heard all of the "evidence bearing on crucial issues of fact." *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 632 (5th Cir. 2001) (quoting Fed. R. Civ. P. 52(c)).

The District Court "'is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.'" *Aubey v. Noble Drilling*, 24 F.3d 240, 1994 WL 242570, *1 (5th

Cir. May 25, 1994) (Table, Text in Westlaw) (quoting 9 Wright & Miller, *Federal Practice and Procedure: Civil* § 2371 at 225).  Rule 52(c) requires the district court to state its findings of fact and conclusions of law when entering a judgment as a matter of law.  These requirements are meant "to engender care on the part of the trial judge in ascertaining the facts and to make possible meaningful review in the appellate courts." *See Gupta v. E. Tex. State Univ.*, 654 F.2d 411, 415 (5th Cir. 1981) (citing *Ramirez v. Hofheinz*, 619 F.2d 442, 445 (5th Cir. 1980)).  When dismissing a case pursuant to Rule 52(c), a court is not required to make any special inferences or review the facts in the light most favorable to the plaintiff.  *Weber v. Gainey's Concrete Products, Inc.*, 159 F.3d 1356, 1998 WL 699047, at *1 n.1 (5th Cir. Sep. 21, 1998) (Table, Text in Westlaw) (citing *Sanders v. General Servs. Admin.*, 707 F.2d 969, 971 (7th Cir. 1983)).  When the findings of fact are based on determinations regarding the credibility of witnesses, Rule 52 demands that even greater deference be given to the trial court's findings.  *Samson*, 242 F.3d at 632 (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985)).

Lawrence named Sheriff Gusman as a defendant in his role as head of the OPP administration and for his assistance in obtaining medical care for him.  His claims against Dr. Gore arise from his inability to obtain adequate medical care from the medical staff at OPP, including Dr. Gore.

Proof of an individual defendant's personal involvement in the alleged wrong is, of course, a prerequisite to his liability on the claim for damages under §1983.  Thus, a supervisory official cannot be held liable pursuant to § 1983 under any theory of *respondeat superior* or simply because an employee or subordinate allegedly violated the plaintiff's constitutional rights.  *See Alton v. Texas*

*A&M University*, 168 F.3d 196, 200 (5th Cir. 1999); *see also Baskin v. Parker*, 602 F.2d 1205, 1220 (5th Cir. 1979).

Supervisory liability also may exist under § 1983 "without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987). The plaintiff must point to a particular policy or lack thereof promulgated by the supervisory defendant that has violated his constitutional rights.

In addition, a supervising officer not personally involved in the acts that deprived the plaintiff of his constitutional rights also may be liable under § 1983 if: (1) the supervising officer failed to train or supervise the subordinate officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's constitutional rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights. *Thompson*, 245 F.3d at 459 (citations omitted). Allegation and proof of a single instance, rather than a pattern of similar violations, normally will not sustain a plaintiff's claim that a lack of training or supervision caused a violation of his constitutional rights. *Id*. (citing *Snyder v. Trepagnier*, 142 F.3d 791, 798-99 (5th Cir.1998); *Thompkins*, 828 F.2d at 304-05). Finally, the inadequacy of the training "must be obvious and obviously likely to result in a constitutional violation ." *Id*. (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).

In the instant case, Lawrence testified that Sheriff Gusman provided him with positive assistance in getting medical attention from the medical staff. He conceded that the Sheriff responded to his requests and was responsible for communicating with Dr. Gore to obtain medical examinations and attention for his uroscopy site and pain. In that regard, Lawrence did not establish

that Sheriff Gusman was intentionally indifferent to his medical needs or directly responsible for any of the policies or actions of the medical staff in disregarding his complaints.  To the contrary, Lawrence instead established that Sheriff Gusman was attentive to his needs and essential to his obtaining medical attention at the jail.  Therefore, the motion was granted on behalf of the Sheriff, and as a matter of law, Lawrence's claims against Sheriff Gusman are dismissed.

On the other hand, Lawrence presented sufficient evidence for the Court to deny the motion as urged by Dr. Gore.  The evidence presented prior to the motion showed that Dr. Gore was personally involved in the allegedly inadequate medical treatment and was responsible for the direct oversight of the medical care provided by the medical staff and for the policies and practices utilized by the medical staff under his supervision.  The motion therefore was denied and additional evidence was received on the claims against him as a supervisor and medical care provider.

C.   **Claims Against the OPP Medical Department**

Lawrence named the OPP Medical Department as a separate defendant.  As indicated previously, §1983 imposes liability on any "person" who violates the constitutional rights of another while acting under color of state law.  42 U.S.C. § 1983 (2006); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989).  In accordance with Fed. R. Civ. P. 17(b), Louisiana law governs whether these defendants can be sued.[5]  Under Louisiana law, to possess such a capacity, an entity must qualify as a "juridical person."  This term is defined by the Louisiana Civil Code as "an entity to which the law attributes personality, such as a corporation or partnership."  La. Civ. Code Ann. art. 24.

---

[5]Rule 17(b) of the Federal Rules of Civil Procedure provides that "capacity to sue or be sued shall be determined by the law of the state in which the district court is held."  *See* Fed. R. Civ. P. 17(b).

Thus, under federal law, a county (or parish) prison facility is not a "person" within the meaning of Rule 17. *Cullen v. DuPage County*, No. 99C1296, 1999 WL 1212570, at *1 (N.D. Ill. Dec. 14, 1999); *Whitley v. Westchester County Corr. Facility Admin.*, No. 97CIV0420(SS), 1997 WL 659100, at *6 (S.D.N.Y. Oct. 22, 1997); *Powell v. Cook County Jail*, 814 F. Supp. 757, 758 (N.D. Ill. 1993); *Hancock v. Washtenaw County Prosecutor's Office*, 548 F. Supp. 1255, 1256 (E.D. Mich. 1982). The Court finds no law, constitutional, statutory, or otherwise, that defines a parish jail or any unit or department therein to be a person with the capacity to sue or to be sued. A parish jail is, as this Court has previously described, "not an entity, but a building." *See Jones v. St. Tammany Parish Jail,* 4 F. Supp. 2d 606, 613 (E.D. La. 1998) (dismissing St. Tammany Parish Jail with prejudice); *Dale v. Bridges*, No. 96-3088, 1997 WL 810033, at *1 n.1 (N.D. Tex. Dec. 22, 1997) (county jail is not a jural entity capable of being sued), *aff'd*, 154 F.3d 416 (5th Cir. 1998). Thus, the medical department at OPP is not a proper defendant and the claims against it are dismissed.

### D.    Claims Against Dr. Gore

Applying the standards set forth above, deliberate indifference by prison personnel, including medical care providers, to a prisoner's medical needs is actionable under § 1983 pursuant to the Eighth Amendment. *See Estelle*, 429 U.S. at 104-105. A prison official is deliberately indifferent if he or she has actual knowledge of a substantial risk of harm to an inmate and disregards that substantial risk. *Farmer*, 511 U.S. at 847; *see also Parrish v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (the standard of deliberate indifference requires actual knowledge and disregard of a substantial risk of serious injury); *Washington v. LaPorte County Sheriff's Dep't*, 306 F.3d 515 (7th Cir. 2002) (same).

In *Estelle*, the Court held that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary wanton infliction of pain," proscribed by the Eighth Amendment. *Estelle*, 429 U.S. at 104.  This is true where the indifference is manifested by prison officials or prison healthcare providers in their response to the prisoner's needs.  It is also true where the indifference is manifested by prison officials and healthcare providers in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Id.*

To state a claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. *Id.*  Further, disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).  Therefore, inadequate medical treatment of inmates, at a certain point, may rise to the level of a constitutional violation, while malpractice or negligent care does not. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993) ("It is clear that negligent medical treatment is not a cognizable basis upon which to predicate a section 1983 action."); *Williams v. Treen*, 671 F.2d 892, 901 (5th Cir. 1982) ("mere negligence in giving or *failing to supply* medical treatment would not support an action under Section 1983." (emphasis added)); *see Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989).

However, a disagreement with a course of treatment does not state a claim for Eighth Amendment indifference to medical needs. *Accord Mendoza*, 989 F.2d at 195.  Even the delay in providing care, regardless of the length of the delay, requires the plaintiff to show a deliberate indifference to a serious medical need in order for it to rise to the level of a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294 (1991); *see also Estelle,* 429 U.S. at 104-05.

In the instant case, the medical and grievance records confirm the factual basis of Lawrence's testimony.  The evidence reflects that Lawrence notified prison officials of his urostomy bag and history of cancer upon his arrival at OPP.[6]  He was seen by Nurse Gray on June 28, 2012,  and she prescribed an ointment, naprosyn and zantac for heartburn. She had him set for a follow-up examination through doctor sick call in two weeks and for a medical record review.[7]  Following her examination, medical records were sought from LSU hospital.

On July 1, 2012, he again requested to see a doctor and advised medical staff of his missed follow-up appointment at LSU on June 28, 2012.[8]  Nurse Thompson noted that he had a rash around the urostomy bag site and added that finding to the list of problems for a pending doctor sick call placed by Nurse Gray.[9]

On July 5, 2012, Lawrence reported to a social worker that he was upset because he had to sleep on the floor due to his inability to climb to an upper bunk and the unavailability of lower bunks.[10]  He also reported the antagonistic behavior of some cell-mates, confirming his concern that the smell had become offensive to others.

Lawrence lodged a grievance complaint, number 707340, on July 12, 2012, asking to be moved to the medical unit, because he was sleeping on the floor and was unable to get medical

---

[6] Plaintiff's Exhibit 1, Intake Screening, 6/28/12; Defendant's Exhibit 1, Intake Screening, 6/28/12; Special Needs Communication, 6/28/12.

[7] Plaintiff's Exhibit 1, Provider Note/Orders, 6/28/12; Defendant's Exhibit 1, Provider Note/Orders, 6/28/12.

[8] Plaintiff's Exhibit 1, Sick Call Request, 7/1/12; Defendant's Exhibit 1, Sick Call Request, 7/1/12.

[9] *Id.*

[10] Plaintiff's Exhibit 1, Social Worker Service Call Notes, 7/5/12; Defendant's Exhibit 1, Social Worker Service Call Notes, 7/5/12.

supplies.[11]  He also again reported his missed follow-up appointment on June 28, 2012.  The first

step respondent, Warden Ezeb, indicated on July 18, 2012, that the medical department would be

notified.  On July 23, 2012, Lawrence completed a second step review adding that the bags at the

prison did not fit correctly and came-off, that he was always wet, and that he was without clean

towels to clean himself.[12]  Seven months later, the Warden's Office finally replied on February 20,

2013 noting that Lawrence rolled out.[13]

On July 24, 2012, Nurse Gray, not a medical doctor, conducted a medical records review and

again examined Lawrence for the rash around the urostomy bag.[14]  She ordered antifungal cream for

the rash, naprosyn, and a stool softener.  She also ordered that he be moved to the medical tier; this

directive was scratched out and marked void.  She also again requested that his LSU medical records

be obtained from LSU and that urostomy bags be ordered in the type he requested.  This directive

was again ignored or overruled.  Nurse Gray also initiated the request for a follow-up appointment

at LSU urology appointment.[15]

On August 14, 2012, Lawrence submitted another grievance form, number 710646,

complaining that he was not receiving needed medical attention, that he was having to hold the bag

---

[11]Plaintiff's Exhibit 1, Grievance Form, 707340, 7/12/12; Defendant's Exhibit 2, Grievance Form, 7/12/12.

[12]Plaintiff's Exhibit 1, Step Two Form, 707340, 7/23/12.

[13]Plaintiff's Exhibit 1, Step Two Response Form, 707340, 2/20/13; Defendant's Exhibit 2, Step Two Response Form, 707340, 2/20/13.

[14]Plaintiff's Exhibit 1, Provider Note/Orders, 7/24/12; Defendant's Exhibit 1, Provider Note/Orders, 7/24/12.

[15]Plaintiff's Exhibit 1, Evidence Based Offender Consult Form, 7/24/12; Defendant's Exhibit 1, Evidence Based Offender Consult Form, 7/24/12.

to keep it attached, and that he had to wrap it with a towel.[16]  Sheriff Gusman replied on August 16, 2012, indicating that he would speak with the medical director regarding the urostomy bags.[17]

Lawrence submitted another grievance form, number 710683, on August 15, 2012, complaining about his cell environment, the leaking urostomy bag, and the need to wrap the bag with a towel.[18]  This too was marked as a request for service by "D Medical Adm."  One month later, on September 17, 2012, Warden Ezeb further responded that he would notify the medical department of Lawrence's concerns.[19]

Lawrence re-urged his complaints in grievance form number 711121 on August 20, 2012.[20]  It was again treated as a request for service.  Almost one month later, on September 17, 2012, "D Medical Adm" responded that he had already been evaluated by a medical provider and that a specialty appointment had been requested.[21]  He was instructed to complete a sick call request form if he needed medical care.

---

[16]Plaintiff's Exhibit 1, Grievance Form, 710646, 8/14/12; Defendant's Exhibit 2, Grievance Form, 710646, 8/14/12.

[17]Plaintiff's Exhibit 1, Step One Response Form, 710646, 8/16/12; Defendant's Exhibit 2, Step One Response Form, 710646, 8/16/12.

[18]Plaintiff's Exhibit 1, Grievance Form, 710683, 8/15/12; Defendant's Exhibit 2, Grievance Form, 710683, 8/15/12.

[19]Plaintiff's Exhibit 1, Step One Response Form, 9/17/12; Defendant's Exhibit 2, Step One Response Form, 9/17/12.

[20]Plaintiff's Exhibit 1, Grievance Form, 711121, 8/20/12; Defendant's Exhibit 2, Grievance Form, 711121, 8/20/12.

[21]Plaintiff's Exhibit 1, Step One Response Form, 711121, 9/17/12; Defendant's Exhibit 2, Step One Response Form, 711121, 9/17/12.

Lawrence submitted a sick call request on September 10, 2012, seeking additional naprosyn, and he was seen by Nurse Thompson.[22]  She noted that he complained of pain at the urostomy site and that his urostomy bags were being changed every two or three days.  She added these complaints to his pending doctor sick call.

Lawrence again filed a grievance form, number 712366, on September 11, 2012, complaining about the living conditions in the tent and his need for pain medication and urostomy bags.[23]  Sheriff Gusman stated he would ask Dr. Gore to review Lawrence's condition and need for pain medication.[24]

Lawrence met again with a social worker on September 14, 2012, and October 4, 2012, reported his stomach pain and his repeated requests to see a doctor.[25]

He filed another grievance form, number 713763, inquiring as to why he was not being allowed to see a doctor or be returned to LSU hospital.[26]  It was forwarded to the medical director for response, and was returned noting that he had not submitted a sick call request form.[27]  He completed the second step review form, but no reply to that is indicated.

---

[22]Plaintiff's Exhibit 1, Sick Call Request, 9/10/12 (dated 8/23/12); Defendant's Exhibit 1, Sick Call Request, 9/10/12 (dated 8/23/12).

[23]Plaintiff's Exhibit 1, Grievance Form, 712366, 9/11/12; Defendant's Exhibit 2, Grievance Form, 712366, 9/11/12.

[24]Plaintiff's Exhibit 1, Step One Response Form, 712366, 9/27/12; Defendant's Exhibit 2, Step One Response Form, 712366, 9/27/12.

[25]Plaintiff's Exhibit 1, Social Worker Service Call Notes, 9/14/12; Social Worker Service Call Notes, 10/4/12.

[26]Plaintiff's Exhibit 1, Grievance Form, 713763, 9/24/12; Defendant's Exhibit 2, Grievance Form, 713763, 9/24/12.

[27]Plaintiff's Exhibit 1, Step One Response Form, 713763, 10/1/12; Defendant's Exhibit 2, Step One Response Form, 713763, 10/1/12.

On October 4, 2012, he was again seen by Nurse Gray.[28]  She noted that the dipstick urine test was <u>positive</u> for blood.  She questioned whether Lawrence was irritating the stoma during dressing.  She noted that a general surgery referral was pending.  She prescribed ultram for his abdominal pain and instructed him to increase his water intake.  She referred him for a follow-up in one week for doctor sick-call with Dr. Dileo for evaluation.

Lawrence completed a sick call request form on October 10, 2012, complaining of continued pain at the surgical site.[29]  He was examined by a nurse on October 10, 2012.  The nurse noted that his urostomy bag was being changed two or three times per week.

In the meantime on October 10, 2012, Lawrence complained on a grievance form again about the pain near his urostomy site and the bag falling off.[30]  The record has no response to this form.

He filed another grievance form, number 715956, on October 11, 2012, complaining of pain and asking to be brought to the hospital.[31]  One month later, "D Medical Adm" responded that the specialty appointment was awaiting scheduling by the hospital.[32]

On October 18, 2012, he filed a sick call complaint asking for additional pain medication.[33] The nurse noted that he was already scheduled for a sick call examination for his pain.

---

[28]Plaintiff's Exhibit 1, Provider Note/Orders, 10/4/12; Defendant's Exhibit 1, Provider Note/Orders, 10/4/12.

[29]Plaintiff's Exhibit 1, Sick Call Request, 10/10/12; Defendant's Exhibit 1, Sick Call Request, 10/10/12.

[30]Plaintiff's Exhibit 1, Grievance Form (no number), dated 10/10/12.

[31]Plaintiff's Exhibit 1, Grievance Form, 715956, 10/11/12; Defendant's Exhibit 2, Grievance Form, 715956, 10/11/12.

[32]Plaintiff's Exhibit 1, Step One Response Form, 715956, 11/13/12; Defendant's Exhibit 2, Step One Respone Form, 715956, 11/13/12.

[33]Defendant's Exhibit 1, Sck Call Request, 10/18/12.

He submitted another grievance form, number 716697, on October 19, 2012, asking for his pain medication.[34]   Six weeks later, on December 7, 2012, "D Medical Adm" responded that Lawrence had already been evaluated and a follow-up appointment had been requested.[35]

In two other grievance forms, numbers 717030 and 717035, submitted October 21 and 23, 2012, he complained that his bag was leaking and he was not given a replacement.[36]   Sheriff Gusman responded to the first form on October 24, 2012, indicating that he would contact the medical unit and have his bag replaced.[37]   About six weeks later, on December 12, 2012, "D Medical Adm" responded to the second form claiming that his concerns had already been addressed.[38]

He again complained on several grievance forms dated October 30, 2012, and November 1, 2012, that he was not receiving the proper type or amount of urostomy bags.[39]   Sheriff Gusman responded to two complaints indicating that he notified the medical director who was to review his condition and address his concerns with the urostomy bags.[40]   Over six weeks later, "D Medical

---

[34]Plaintiff's Exhibit 1, Grievance Form, 716697, 10/19/12; Defendant's Exhibit 2, Grievance Form, 716697, 10/19/12.

[35]Defendant's Exhibit 2, Step One Response Form, 716697, 12/7/12.

[36]Plaintiff's Exhibit 1, Grievance Form, 717030, 10/21/12; Grievance Form, 717035, 10/23/12; Defendant's Exhibit 2, Grievance Form, 717030, 10/23/12; Grievance Form, 717035, 10/23/12.

[37]Plaintiff's Exhibit 1, Step One Response Form, 717030, 10/24/12; Defendant's Exhibit 2, Step One Response Form, 717030, 10/24/12.

[38]Plaintiff's Exhibit 1, Step One Response Form, 717035, 12/12/12; Defendant's Exhibit 2, Step One Response Form, 717030, 12/12/12.

[39]Plaintiff's Exhibit 1, Grievance Form (no number), dated 10/30/12; Grievance Form, 717641, 10/30/12; Grievance Form, 717646, 10/30/12; Grievance Form, 718019, 11/1/12; Grievance Form, 718020, 11/1/12; Defendant's Exhibit 2, Grievance Form, 717641, 10/30/12.

[40]Plaintiff's Exhibit 1, Step One Response Form, 717646, 10/31/12; Step One Response Form, 718019, 11/2/12; Defendant's Exhibit 2, Step One Response Form, 717646, 10/31/12; Step One Response Form, 718019, 11/2/12.

Adm" responded to two of the forms stating that the specialty appointments had to be requested from and scheduled by the hospital, and they were waiting for the appointment to be scheduled.[41]

Lawrence was examined by Dr. Gore on November 2, 2012.[42]  He noted that his medical records still were not available from LSU, and that the follow-up appointment at LSU had been ordered but not yet scheduled.  He directed that urostomy bags with thick gel adhesive be ordered. He directed that the LSU urology clinic records be obtained and the urology referral be resent.  He also ordered the pain medication and medication to avoid constipation.

On December 10, 2012, and December 13, 2012, Lawrence again submitted grievance forms complaining about the need to change his bag.[43]  Sheriff Gusman responded to one complaint on December 14, 2012, indicating that he would have the medical director and medical department provide him with care.[44]  One month later, on January 14, 2013, "D Medical Adm" responded, indicating that he was provided with the necessary medical supplies and pain medication.[45]

In the meantime, he was seen by Dr. Dileo on December 12, 2012, and he ordered that Lawrence's bags be changed three times per week to avoid bacterial colonization.[46]  He also ordered a follow-up visit in six weeks to check the ostomy site.

--------

[41]Plaintiff's Exhibit 1, Step One Response Form, 717641, 12/18/12; Step One Response Form, 718020, 12/20/12; Defendant's Exhibit 2, Step One Response Form, 717641, 12/18/12; Step One Response Form, 718020, 12/20/12.

[42]Plaintiff's Exhibit 1, Provider Note/Orders, 11/2/12; Defendant's Exhibit 1, Provider Note/Orders, 11/2/12.

[43]Plaintiff's Exhibit 1, Grievance Form (no number), 12/10/12; Grievance Form, 721229, 12/13/12; Grievance Form, 721169, (no date); Defendant's Exhibit 2, 721169, (no date).

[44]Plaintiff's Exhibit 1, Step One Response Form, 721169, 12/14/12; Defendant's Exhibit 2, Step One Response Form, 721169, 12/14/12.

[45]Plaintiff's Exhibit 1, Step One Response Form, 721229, 1/14/13; Defendant's Exhibit 2, Step One Response Form, 721229, 1/14/13.

[46]Plaintiff's Exhibit 1, Provider Note/Orders, 12/12/12; Defendant's Exhibit 1, Provider Note/Orders, 12/12/12.

Lawrence completed a sick call form on December 19, 2012, complaining about pain at the uroscopy site for which he was taking naprosyn.[47]  Nurse Hogan referred him to doctor sick call.

He was seen on January 2, 2013, by a doctor for constipation causing abdominal pain.[48]  He was told to increase his water intake and given milk of magnesia.  His follow-up appointment with the urology clinic was again mentioned.

On January 10, 2013, at the direction of the Court, he was routed to the hospital for examination.[49]  He was prescribed ciprofloxacin, milk of magnesia, naprosyn, fibercon, and a change of uroscopy bag daily for 30 days.[50]

On January 12, 2013, Lawrence filed another grievance form complaining that the hospital doctor directed that his uroscopy bag be changed daily because of an infection at the stoma site and that Nurse Thomas did not provide him with a daily bag.[51]  The response dated over one month later, on February 20, 2013, indicates that Lawrence rolled out of prison.[52]

On January 20, 2013, Dr. Gore authorized the nursing staff to give Lawrence tape to place around the stoma to secure the bag while showering.  At that time, the prison was providing a bag change about three times per week.[53]

---

[47]Plaintiff's Exhibit 1, Sick Call Request, 12/19/12; Defendant's Exhibit 1, Sick Call Request, 12/19/12.

[48]Plaintiff's Exhibit 1, Provider Note/Orders, 1/2/13; Defendant's Exhibit 1, Provider Note/Orders, 1/2/13.

[49]Plaintiff's Exhibit 1, Medical Route Form, 1/10/13; Provider Note/Orders, 1/10/13; Defendant's Exhibit 1, Provider Note/Orders, 1/10/13; Medical Route Form, 1/10/13.

[50]Plaintiff's Exhibit 1, LSU Health, 1/10/13; Defendant's Exhibit 1, Provider Note/Orders, 1/11/13; LSU Health, 1/10/13; Nurse Notes, 1/11/13.

[51]Plaintiff's Exhibit 1, Grievance Form (no number), 1/12/13.

[52]Plaintiff's Exhibit 1, Step One Response, 713763, 2/20/13.

[53]Plaintiff's Exhibit 1, Nurse Notes, 1/25/13; Defendant's Exhibit 1, Provider Note/Orders, 1/25/13; Nurse's Notes, 1/25/13.

He was examined by a doctor again on February 13, 2013, and the doctor ordered the continuation of the order to change bags three times per week and ordered an ointment for Lawrence's face irritation.[54]

The one page medication administration form provided by defendants indicates the urostomy bag was to be changed when needed.[55]  However, the form shows that Lawrence received a total of eight bags in August 2012 on the following days:  August 3, 6, 8, 14, 15, 16, 21, and 24.  He did not receive another bag until 14 days later, on September 7, 2012.  He also received a bag on September 10, 13, 21, and 28, for a total of five bags in September. In October 2012, he received bags on the following dates: October 1, 5, 12, 15, 17, 19, 22, 24, 27, and 31. In November 2012, Lawrence was given bags on the following dates: November 2, 7, 9, 14, 16, 19, 21, 23, 26, 28, and 30. In December 2012, the record indicates that he received nine bags: December 3, 5, 8, 12, 14, 17, 19, 21, and 28. Finally, in January 2013, he received only three bags: January 5, 25, and 27. The record provided does not contain any reference to bags provided to Lawrence before August 2012 or after January 2012.

Based on the testimony received at trial, it appears that Lawrence had to provide his own urostomy bags until August 3, 2012, when the prison first indicates that he was provided with a bag. As suggested by his testimony, Lawrence would have had only six bags from home to last from his arrival on June 28, 2012, until August 3, 2012, when provisions are indicated at the prison.

Dr. Gore himself testified that the bags are typically changed about every three days.  The specific orders written in the prison records were for the bags to be changed every three days.  The

---

[54]Plaintiff's Exhibit 1, Provide Note/Orders, 2/13/13; Defendant's Exhibit 1, Provider Note/Orders, 2/13/13.

[55]Defendant's Exhibit 1, Medication Administration Record, August 1, 2012 to January 31, 2013.

records reflect, however, that the bag provisions were at best sporadic and erratic in August, September, December and January.

In fact, on January 10, 2013, the LSU doctor who was finally treating his infected stoma area ordered that the bags be changed once a day every day for 30 days.  In spite of this clear directive, the prison medical staff still insisted on a three day change schedule.  Even with this internal instruction, the prison's own records reflect Lawrence received only three bag changes during the entire month of January 2013.

In addition, in spite of his consistent complaints and numerous grievances, Lawrence was not seen by a medical doctor until over two months after his arrival at the prison.  Even when he was placed by medical personnel on a doctor sick call list and blood was found in his urine, he was seen only by nurses who did nothing more but tell him to await a doctor sick call.  The records also confirm that he was only seen by doctors after Sheriff Gusman personally intervened.

Dr. Gore testified that he has no specific policy to follow-up on requested appointments with the outside facilities.  Instead, the requests are made with no further inquiry, even if no appointment is ever returned.  In this case, a month went by after Lawrence's arrest before any effort was made to even request an appointment with LSU urology.  Months after that, the need to resend the request for an appointment was noted.  However, the records do not clearly reflect that the referral orders were re-sent after the initial attempt by Nurse Gray in July 2012.

Furthermore, the need to resend the request for an appointment was only acknowledged after continued complaints and grievances by Lawrence.  Even then, the medical personnel, including Dr. Gore, exercised no urgency to get Lawrence the needed post-operative care even with consistent pain, rashes, and positive blood in his urine.  When Lawrence was properly examined at LSU, he

was found to have an infection that required long-term antibiotic treatment. The need to change his bags daily was also found necessary. In spite of this, the medical staff including Dr. Gore, did not comply, perhaps prolonging the infection.

Underlying the troubles faced by Lawrence was the continued and curious disregard for the malfunctioning ostomy bags. Rather than evaluate him for properly fitting and functioning bags, he was provided with bags (when he was provided any at all) that did not work with his stoma and/or for which he was not provided instructive assistance other than tape and towels.

The records reflect that Nurse Gray, the only "provider" to actually examine him in the first few months, instructed that bags be ordered for him based on the kind he wanted. This direction was apparently disregarded by other staff or overruled by the supervisory doctor, Dr. Gore, just as was her request to place Lawrence in the medical unit in July.

The Court is convinced that the circumstances of Lawrence's care and treatment, or lack thereof, was more than just a mere disagreement over bag design or preference. The circumstances here display intentional disregard for his health, the cleanliness and care of his relatively fresh stoma and uroscopy site, as well as his physical comfort. As a result of the superficial concern shown, he suffered for months with intestinal discomfort, pain, skin rashes, and eventually an infection requiring lengthy antibiotic treatment.

While some medication was ordered for him, the records indicate that his receipt of that medication was often not in conformity with the prescription. The Court points to two examples that are most disturbing and yet confirming of Lawrence's claims.

On June 28, 2012, Nurse Gray ordered a topical cream for Lawrence to use twice a day on the urostomy bag area. The medication chart indicates that it was not started on his chart until July

24, 2012 through July 30, 2012.[56]  However, the chart does not indicate it was actually given to him at all as the recording spaces are blank.

The records contain similar disturbing information with regard to the ciprofloxacin ordered by the LSU doctors on January 10, 2013.[57]  The recording spaces indicate that he received the medication in January 11, 2013 and the remaining spaces are blank.

The Court finds that Dr. Gore must be held to answer for the indifference shown to Lawrence's care both directly and as a supervising authority.  Based on his own testimony, the medical staff is allowed to function with little correction or review.  The ostomy supplies provided are not individualized but instead based on the supplies on hand and perhaps Dr. Gore's preference rather than medical function.  While he certainly has the professional training to have such a preference, Dr. Gore allowed or chose treatment for Lawrence for months without examining him. When he did finally see Lawrence personally, he sought to order alternative bags for him but the record does not indicate that any such bags were obtained or provided.  The record is clear, however, that even after months of problems, pain and rashes, and the follow-up visit at LSU, Dr. Gore directed and approved the use of tape to help hold the mal-fitting bags on while Lawrence showered.

Dr. Gore admitted during his testimony that water leaking into the urostomy site or bag would lead to bacterial colonization and growth.  Knowing this, Lawrence still was not provided with properly fitting and durable bags and was knowingly left to absorb the urine with towels.  As a result, just as Dr. Gore would have expected, he had blood in his urine, developed rashes and an infection, and had difficulty keeping the bag and site clean and sterile.

---

[56]Defendant's Supplemental Exhibit 1, Routine Medication Administration Record, 7/2012.

[57]Defendant's Supplemental Exhibit 1, Routine Medication Adminstration Record, 1/2013.

For the foregoing reasons, the Court finds that Lawrence has established that Dr. Gore as a medical care provider and as a supervising physician was intentionally indifferent to the known health risks he faced and denied him constitutionally adequate medical care.  In addition, the Court recognizes that the persistent abdominal pain, rashes, and infections are evidence of physical injury resulting from the denial of adequate medical care.  *See Davis v. Roundtree*, No. 12-30784, 2013 WL 5274497, at *2 (5th Cir. Sep. 19, 2013) (ear infections, hearing loss, spells of dizziness, and loss of balance amounted to more than *de minimis* injury in inadequate medical care case); *Burton v. Owens*, 511 F. App'x 385, 386 (5th Cir. 2013) (using infection as an example of physical injury in inadequate medical care case).

### E.   <u>Qualified Immunity Defense</u>

The defendants have raised qualified immunity as a defense.  Because the Court has not found liability on the part of Sheriff Gusman, the defense is addressed as to Dr. Gore.

The doctrine of qualified immunity, "shield[s] [officers] from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  To determine whether a defendant is entitled to qualified immunity, this Court must address the factors: "(1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct."  *Edwards v. Loggins*, No. 11-10692, 476 Fed. App'x 325, 328, 2012 WL 1758162, at *2 (5th Cir. May 16, 2012) (quoting *Jennings v. Patton*, 644 F.3d 297, 300 & n.3 (5th Cir. 2011) (internal quotation marks and citation omitted).  "Although nominally an affirmative defense, the plaintiff has the

burden to negate the defense once properly raised." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

In this case, the Court has positively answered the first query finding that Dr. Gore was intentionally indifferent to Lawrence's need for, and denied him, adequate medical care. The right to adequate medical care is well established, and Dr. Gore should have known that failure to provide adequate care for Lawrence's urostomy site under the circumstances of this case was prohibited by law. His actions were not objectively reasonable under the circumstances. The Court therefore denies the defendant's request for qualified immunity in this case.

## III.   Proven Damages

The evidence presented at trial is sparse at best in offering proof of the value of any injury or compensable damage done to the plaintiff as a result of the inadequate medical care. Having found that an injury did occur, the Court is left to posit nothing more than general damages for the pain and suffering. The credible evidence showed that Lawrence suffered a lingering infection, pain, and skin rashes as a result of the lack of care and proper medical supplies. These matters persisted from at least July 2012 through March or April 2013, after he was released and able to get follow-up care and other medical supplies. This is the extent of the proven span of damage or injury recoverable. Without proof of any other special damages, the Court is not able to assign a value beyond those general damages for past pain and suffering. In addition, Lawrence concedes that he has no extenuating problems arising from the period of inadequate care he received at the prison.

In an effort to obtain guidance on the issue of the appropriate amount of damages for this type of infection and rash, the Court has considered compensatory damages awarded in cases in which a prisoner was denied medical care which led to these conditions.

The damages awards vary widely in cases of inadequate medical care for prisoners based on the extent of the past and future damages.  *See Woods v. Carey*, 488 F. App'x 194, 196 (9th Cir. 2012) (affirmed a jury verdict awarding Woods $500 in compensatory and $1,000 in punitive damages against prison official for denial of dental care); *Thompkins*, 828 F.2d at 301 (affirmed district court's award of $4,500 for the three and a half months during which inmate suffered pain and discomfort caused by the lack of proper treatment for back injury); *Lijadu v. United States*, No. 06-0518, 2009 WL 508040, at *1-*2 (W.D. La. Feb. 26, 2009) (court awarded $50,000 for past pain and suffering after inmate was deprived of adequate medical care for his broken wrist, ulcerative colitis, HIV positive status, and dental and digestive difficulties resulting in serious physical and mental suffering as a result); *Lawson v. Dallas County*, 112 F. Supp.2d 616, 637 (N.D. Tex. Aug. 29, 2000) (awarding $150,000.00 for past pain and suffering and mental anguish to paraplegic inmate who was not provided adequate medical which led to three surgeries, disfigurement and minimal rehabilitative potential).

In this case, Lawrence suffered pain, discomfort, rash and untreated infection over the course of at least nine months while in the care of the defendant.  He has no future damages and only past pain and suffering.  Thus, in light of the evidence and testimony and the foregoing awards, the Court finds a reasonable amount of damages for the denial of medical care in this case to be $20,000.00.

## IV.   Conclusion

Accordingly, for the foregoing reasons, and considering the evidence adduced at trial,

**IT IS ORDERED** that the defendants Motion for Judgment as a Matter of Law is **GRANTED in part** as to the plaintiff's 42 U.S.C. § 1983 claims against Sheriff Gusman and the

claims against Sheriff Gusman are **DISMISSED WITH PREJUDICE**; and **DENIED in part** as to the §1983 claims against Dr. Gore.

 **IT IS FURTHER ORDERED** that Lawrence's § 1983 claims against the medical department at OPP are **DISMISSED WITH PREJUDICE**.

 **IT IS FURTHER ORDERED** that Lawrence's § 1983 claims of intentional indifference and inadequate medical care  against Dr. Gore are found to have merit, and the Court hereby awards Lawrence damages in the amount of $20,000.  Judgment shall be entered accordingly.

    New Orleans, Louisiana, this 22nd day of January, 2014.

      _____

      **KAREN WELLS ROBY**
     **UNITED STATES MAGISTRATE JUDGE**